**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

---

|  |  |  |
|---|---|---|
| JOSEPH A. MCPEAK, individually and on behalf of all similarly situated individuals, | : : : | |
| Plaintiff, | : : | Civil No. 12-348 (RBK/KMW) |
| v. | : : | **OPINION** |
| S-L DISTRIBUTION COMPANY, INC. Defendant. | : : : | |

---

**KUGLER**, United States District Judge:

This matter comes before the Court upon the motion by Joseph A. McPeak ("Plaintiff")
for leave to file a Second Amended Complaint ("SAC"). Plaintiff previously filed an Amended
Class Action Complaint, alleging that his distribution agreement with S-L Distribution Company
("Defendant")[1] constituted a franchise under the meaning of the New Jersey Franchise Practices
Act ("NJFPA") and that S-L violated the statute when it unilaterally terminated the agreement.
This Court previously dismissed Plaintiff's Amended Class Action Complaint without prejudice,
and he now seeks to cure the defects in his previous pleading. Although the general basis for his
claims are similar to those set forth in his previous pleadings, the Court finds that it would not
be futile to amend the pleading. Accordingly, Plaintiff's motion will be **GRANTED**.

## I.       BACKGROUND AND PROCEDURAL HISTORY

---

[1] S-L Distribution Company is the distribution division of the Synder's-Lance, Incorporated, a maker of snack foods.
SAC ¶¶ 1, 15.

The factual allegations of this case have been set forth in the Court's Opinion dated

December 19, 2012 as follows:

> On October 27, 2006, Plaintiff contracted with S-L (formerly known as SOH Distribution Company, Inc.) to obtain the exclusive right to sell and distribute certain products in a specified geographic region in Southern New Jersey. See Amend. Compl. ¶¶1, 22. The contract, entitled "Distributor Agreement," classified Plaintiff as an independent contractor and explicitly stated that "nothing herein shall be construed: (i) to be inconsistent with that relationship; (ii) as constituting Distributor as the franchisee, partner, agent, or employee of SOH." Pl. Amend. Compl., Ex. B at 2. The contract further contained a provision that Plaintiff, the distributor, "understands and acknowledges that this Agreement is not a franchise agreement. This Agreement does not provide the Distributor with a franchise to distribute Authorized Products under a marketing plan or system prescribed by SOH." Id. at 16. The contract also prohibited Plaintiff from conducting "his business under SOH's name, or the trademarks or tradenames of any of the Authorized Products or Other Products." Id. at 12. Under the contract's terms, Plaintiff could not use S-L's "name, or the trademarks or tradenames of any of the Authorized Products or Other Products for any reason, whatsoever, except upon receiving SOH's prior written consent." Id.

> The contract required Plaintiff to, among other things, "use his best efforts" to sell certain products to authorized outlets and retail centers within the designated territory, comply with the standard operating guidelines, develop new accounts and additional shelf space for the respective products, and to "establish and to maintain the established, [sic] reputation and good will of the Authorized Products." Id. at 4. The contract also reserved S-L's right to authorize other persons from time to time to act as SOH's wholesaler in an area that included Plaintiff's territory. Id. at 6.

> For several years, Plaintiff invested capital, labor, and "specialized skills" into his business, leading to an approximate twenty-five percent increase in sales and a two hundred percent increase in the "market value" of his distributorship. Pl. Opp'n. at 6. Unfortunately, in November 2011, Plaintiff received notice that S-L was terminating the distributor agreement. Id. at 5. Plaintiff alleges that after news spread of S-L's termination of the distributor agreements, his business became "worthless" because "[n]o prospective purchaser would agree to purchase a business that would essentially disappear within days." Pl. Amend. Compl. ¶¶ 51-54. On January 3, 2012, S-L allegedly modified Plaintiff's "exclusive right to sell territory by reducing its size," leading to an almost fifty percent reduction in Plaintiff's sales volume. Id. at ¶56. Plaintiff and S-L executed a revised contract that required Plaintiff to use only advertising supplied or approved by S-L. Pl. Amend. Compl., Ex. C at 14. The provisions prohibiting Plaintiff's use of S-L's trademarks and explicitly repudiating that Plaintiff was a franchisee were also contained in the new agreement. See Id. at 3, 14, 21.

On January 19, 2012, Plaintiff filed the instant lawsuit against S-L, asserting a claim on behalf of himself and other allegedly similarly situated individuals for declaratory, injunctive, and monetary relief. Pl. Opp'n at 12; Pl. Amend. Compl. ¶10. In his Amended Class Action Complaint, Plaintiff alleges that S-L illegally terminated his franchise in violation of the NJFPA. Pl. Amend. Compl. ¶¶ 66-88. On March 8, 2012, Plaintiff sold his distributorship back to S-L. Pl. Opp'n at 12.

McPeak v. S-L Distribution Co., Civ. No. 12-348, 2012 WL 6652764, at *1-2 (D.N.J. Dec. 19, 2012) (ECF Doc. No. 29).

Pursuant to its Opinion of December 19, 2012, this Court found that Plaintiff failed to plead a factual basis for his claim that he owned a franchise within the meaning of the NJFPA. In order to do so, he was required to plead facts sufficient to support a finding that S-L granted him a license to use its trade name and that a community of interest existed between the parties. Plaintiff's allegations that he had the exclusive right to sell and distribute Snyder's-Lance products within a defined territory were insufficient to arrive at a finding that a license existed. Plaintiff's right to use the Snyder's-Lance name and insignia was similarly insufficient, as was the general allegation that some retail customers believed that S-L was responsible for the overall performance, quality, image, good will, and service provided by Plaintiff, or believed that they were dealing with S-L itself when dealing with Plaintiff or that S-L vouched for the activities of Plaintiff. The Court also rejected an argument by Defendant that Plaintiff had no standing to pursue his claims because he no longer owned his distributorship at the time the motion was decided.[2]

Although Defendant's motion to dismiss was granted, this Court indicated in its Order that Plaintiff could request leave of the Court to file a Second Amended Complaint. Plaintiff

---

[2] The Court found, however, that because Plaintiff sold his route, he could not obtain injunctive or declaratory relief, but could only be awarded monetary relief. McPeak v. S-L Distribution Co., Civ. No. 12-348, 2012 WL 6652764, at *3 (ECF Doc. No. 29).

filed a motion seeking such leave on January 4, 2013. See ECF Doc. No. 31. Then, on January 18, 2013, Plaintiff filed a notice of appeal to the United States Court of Appeals for the Third Circuit. See ECF Doc. No. 34. On February 20, 2013, this Court denied Plaintiff's motion seeking leave to amend without prejudice, observing that the notice of appeal filed by Plaintiff divested the district court of its jurisdiction to hear aspects of the case involved in the appeal. See ECF Doc. No. 38. Subsequently, the Third Circuit dismissed the appeal for lack of jurisdiction, finding that the Order of this Court was not a "final order," and that "there is no indication that the deficiencies of the amended complaint cannot be cured." See ECF Doc. No. 39. This motion followed.

## II.    LEGAL STANDARD

Under the Federal Rules of Civil Procedure, leave to amend pleadings shall be "freely give[n]" when "justice so requires." Fed. R. Civ. P. 15(a)(2). In Foman v. Davis, 371 U.S. 178 (1962), the Supreme Court articulated the liberal policy of allowing amendments underlying Rule 15(a) as follows:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

Foman, 371 U.S. at 182; see also Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000).

In determining if a proposed amendment should be denied based on futility grounds, courts employ the "same standard of legal sufficiency as applies under [Federal] Rule [of Civil Procedure] 12(b)(6)." Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 175 (3d Cir. 2010) (citations omitted); see also Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir.

4

2000) ("An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted.").  Under Rule 12(b)(6), a motion to dismiss may be granted if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). While "detailed factual allegations" are not necessary, a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Id. at 555; see also Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).

## III.   DISCUSSION

Defendant opposes the motion to amend on two primary grounds.  First, Defendant argues that filing the SAC would be futile, because like the complaint previously dismissed by this Court, it does not state a claim under the NJFPA because that Act does not apply to the parties' distributorship agreement.  Defendant also argues that Plaintiff should not be granted leave to amend because of undue delay and dilatory tactics on the part of Plaintiff, and because granting leave would be prejudicial to Defendant.  The Court will consider the issues in turn.

### A.  New Jersey Franchise Practices Act

Enacted in 1971, the NJFPA was aimed at curbing the tendency of franchisors to unduly profit from their superior economic and bargaining positions when negotiating agreements with potential franchisees.  Goldwell of New Jersey, Inc. v. KPSS, Inc., 622 F. Supp. 2d 168, 184 (D.N.J. 2009) (citing Westfield Centre Serv., Inc. v. Cities Serv. Oil Co., 86 N.J. 453, 461-62 (1981)); see also Goldsworthy v. Browndorf, 2011 WL 3687401, at *3 (N.J. App. Div. Aug. 24, 2011) (explaining that the NJFPA "reflects the legislative concern over long-standing abuses in the franchise relationship, caused by the power disparity between franchisors and franchisees")

(citation and internal quotations omitted). To remedy this problem, the Act, among other things, creates "an exception to the general rule that two businesses are free to terminate their business relationship according to the terms of their contract." New Jersey American, Inc. v. Allied Corp, 875 F.2d 58, 61 (3d Cir. 1989). Except under two limited circumstances, a franchisor may not terminate, cancel, or fail to renew a franchise subject to the NJFPA unless it provides advanced written notice of such action and it does so for "good cause." N.J.S.A. 56:10-5.

In 2010, the NJFPA was amended to extend its protections not only to "retail businesses, but also wholesale distribution franchisees that, through their efforts, enhance the reputation and goodwill of franchisors in this State." N.J.S.A. 56:10-2. In amending the Act, the state legislature noted that "courts have in some cases more narrowly construed the Franchise Practices Act than was intended by the Legislature." Id.; see also 2009 N.J. Sess. Law Serv. 235 (Assembly 2491).

Given the NJFPA's regulatory reach into traditionally private business affairs, the scope of the Act is necessarily limited. Accordingly, a party seeking relief under the NJFPA must demonstrate that the business relationship into which it has entered meets the Act's threshold requirements. See N.J.S.A. 56:10-4. The NJFPA further applies to a franchise only if "the performance of [that franchise] contemplates or requires the franchisee to establish or maintain a place of business within the state of New Jersey." N.J.S.A. 56:10-4(a)(1).

For the purposes of the NJFPA, a franchise is defined as a "written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise." N.J.S.A. 56:10-3. Neither party disputes that the first statutory element requiring a

written arrangement is satisfied.  Thus, in order to establish that he has a franchise that is entitled to the Act's protections, Plaintiff must plead facts sufficient to support a finding that S-L granted him a license to use its trade name and that there was a community of interest.  See id. Defendant also raises the argument that Plaintiff did not maintain a place of business in New Jersey, as required by the NJFPA.

1. License to use the S-L trade name

The New Jersey Supreme Court has declared that "not every grant of permission to use a trademark in the sale of goods or services is a 'license' within the meaning of the Franchise Act." Instructional Sys., Inc. v. Computer Curriculum Corp. ("ISI"), 130 N.J. 324, 352 (1992). Instead, the "hallmark of the franchise relationship is the use of another's trade name in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the trade name licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee in respect of the subject of the trade name." Neptune T.V. & Appliance Serv., Inc. v. Litton Sys., Inc., 190 N.J. Super 153, 160 (App. Div. 1983).  As such, "the license contemplated by the Act is one in which the franchisee wraps himself with the trade name of the franchisor and relies on the franchisor's goodwill to induce the public to buy." Liberty Sales Assocs., Inc. v. Dow Corning Corp., 816 F. Supp. 1004, 1010 (D.N.J. 1993).

When interpreting the NJFPA, a court must therefore consider not only the parties' written agreement, but also their relationship, in order to determine whether a license exists.  ISI, 130 N.J. at 353; Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery, 179 F.R.D. 450, 471 n.9 (D.N.J. 1998).  Where a franchisor gives its approval to the franchisee's business enterprise so that the public is induced to expect from the franchisee "a uniformly acceptable and quality controlled service endorsed by [the franchisor] itself," a license may exist.  Cooper Distrib. Co.

v. Amana Refrigeration, Inc., 63 F.3d 262, 272 (3d Cir. 1995) (quoting Neptune T.V., 190 N.J. Super at 160-61).

For example, in Cooper, the Third Circuit found that Cooper Distributing Company, a distributor and service provider for Amana Refrigeration's line of appliances, possessed a license in Amana's trade name under the NJFPA. Cooper, 63 F.3d at 273. The Court cited relevant factors such as Cooper being the "exclusive Amana distributor and servicer of Amana products," an Amana sign on display in Cooper's showroom, Cooper service technicians wearing Amana uniforms, and a requirement that Cooper use "its best efforts" to promote Amana sales. Id. at 272-73. Cooper also provided warranty service on Amana products, and there was testimony that "Amana vouch[ed] for Cooper by standing behind the quality of what it sells." Id. at 272-73.

Applying the requirements for existence of a license to this case, the Court observes the following allegations that Plaintiff added to his SAC, which he argues satisfy the standard for a license:

1. S-L provided Plaintiff and other distributors with business cards bearing the Snyder's of Hanover logo and slogan. SAC ¶ 44.

2. S-L mandated the use of its invoices for all customers on a daily or weekly basis. The invoices bear the Snyder's of Hanover name, S-L's address, phone number, and web address, and state: "Thank you for doing business with SNYDER'S OF HANOVER, INC." Id. ¶ 42.

3. S-L provided Plaintiff and other New Jersey distributors with a telephone number and voice mailbox for customers to use. Id. ¶ 44.

4. Plaintiff includes, as an exhibit to his complaint, an email dated February 16, 2012, from S-L Area Sales Manager Brian Volker to a K-Mart employee stating that "We agreed to place 1 cardboard hutch in each of your stores . . . We will bring in the hutches by Sat., 2/25 . . . Snyder's salespeople will be in the store to service the display on a weekly basis . . . ." Plaintiff alleges that he and other distributors are the Snyder's salespeople referred to in the email. Id. ¶ 43, Ex. E.

5. S-L provided Plaintiff with jackets, shirts, hats, and other apparel bearing S-L trademarks and logos to wear while he worked. Plaintiff includes photographs of these items in the SAC. Id. ¶ 45.

6. The agreement between the parties allowed Plaintiff to display S-L trademarks on his vehicle at S-L's expense. Plaintiff also includes photographs of the vehicles in his complaint. Id. ¶ 46.

See Pl. Motion to Amend at 6. As this Court previously indicated, authorization and/or a requirement to use the name of Snyder's-Lance does not create a license; otherwise every distributorship would be converted into a franchise. See Atlantic City Coin & Slot Serv. Co. v. IGT, 14 F. Supp. 2d 644, 664 (D.N.J. 1998); ISI, 130 N.J. at 352 (quoting Colt Indus., Inc. v. Fidelco Pump & Compressor Corp., 844 F.2d 117, 120 (3d Cir. 1988)).

Here, the primary group of consumers of S-L's product is made up of retail stores that sell Snyder-Lance products to the ultimate consumers. The email attached to the SAC, calling franchisees "Snyders salespeople" could be taken to plausibly indicate an instance of S-L "vouch[ing], as it were," for Plaintiff and other persons with a distributorship agreement who are referred to as "Snyder's salespeople." ISI, 130 N.J. at 352. It could also be viewed as a sign of approval and endorsement by S-L.

Defendant objects that Plaintiff does not allege that the email actually led the recipient or anyone else to believe that S-L vouched for his services. See Def. Opp'n at 22. However, Defendant has cited no law suggesting that a complaint must actually allege that specific members of the consuming public were, in fact, led to believe a certain thing.[3] Plaintiff has cited specific facts that could plausibly lead Plaintiff's customers to believe that S-L vouches for his services. He is entitled to attempt to develop evidence that such a belief was reasonable and that customers actually believed that S-L vouched for the services provided by Plaintiff.

Defendant also repeatedly characterizes McPeak's business as that of distributing an "off-the-shelf" product, and argues that "use or promotion of a name or trademark of brand-name, 'off-the-shelf' products by a distributor categorically does not constitute the grant of a license." Def. Opp'n at 23. However, Defendant's position that a wholesale distributor of an "off-the-shelf" product can never be afforded the protections of the NJFPA is at odds with the plain language of the Act, which indicates that its protections may extend to "wholesale distribution franchisees." N.J.S.A. 56:10-2. Thus, to the extent that the cases cited by Defendant that were decided prior to the 2010 amendments to the NJFPA purport to require some type of value-added services, the Court does not find these cases persuasive in applying the Act as presently codified.[4]

Here, the Court finds that by pleading that S-L employees referred to Plaintiff and other distributors as "Snyder's salespeople," coupled with the allegations related to S-L trademarks on the clothing and vehicles used by Plaintiff and other distributors—factors found relevant by New

---

[3] The existence of evidence indicating that specific customers believed that S-L vouched for Plaintiff's activities may, however, be relevant at the summary judgment stage. See Oracle America, Inc. v. Innovative Tech. Distrib. LLC, Civ. No. 11-2135, 2012 WL 4122813, at *11 (N.D. Cal. Sept. 18, 2012) (weighing testimony that customers believed that the franchisor vouched for a franchisee's activity in deciding a summary judgment motion).

[4] For example, ISI, decided prior to the 2010 amendments to the NJFPA, indicated that one of several factors that it considered in determining that a license existed was that the product in that case was not "an 'off-the-shelf' product." ISI, 130 N.J. at 353.

Jersey courts—Plaintiff meets the minimum pleading requirements for demonstrating the existence of a license.

2. Community of Interest

Defendant also incorporates, by reference to its prior motion to dismiss, the argument that Plaintiff has not sufficiently pleaded that a "community of interest" exists between Plaintiff and S-L.[5]  New Jersey courts have indicated that the "community of interest" standard is applicable when a franchisor endeavors to "reach his ultimate consumer through entities other than his own which, although legally separate, are nevertheless economically dependent upon him."  Neptune T.V., 190 N.J. Super. at 163.  New Jersey courts have specifically referred to the situation where a franchise involves "distribution of the franchisor's products" as an example of "community of interest."  Id.  Economic dependence has also been described as "the most important factor" in determining whether a community of interest exists.  Cooper, 63 F.3d at 272.  Plaintiff pleads that S-L reaches its ultimate consumers through Plaintiff and other similarly situated distributors. See SAC ¶ 23 ("a vast majority (if not all) of S-L's sales are accomplished through wholesale resellers like Plaintiff.").  He also pleads that he received all of his business from the distributorship agreement.  See id. ¶ 48.  ("All of Plaintiff's gross sales are derived from the franchise; Plaintiff's business does not have any other source of income.").  The SAC thus pleads economic dependence.

Defendant has argued that no community of interest exists because Plaintiff's distributorship was transferrable, and because he could sell other products besides S-L products (although he evidently did not actually do so).  Def. Reply in Support of Mot. Dismiss at 13-14. Defendant therefore argues that any economic dependence was "of his own choosing."  Id. at 14.

<hr />

[5] The Court did not reach this issue in its Opinion of December 18, 2012, and thus discusses it here, referring to the arguments of the parties in connection with S-L's motion to dismiss, filed on May 29, 2012.  See ECF Doc. No. 20.

But the NJFPA applies where there "is" a community of interest, and says nothing about whether the community of interest might have been avoided had one of the parties not put all of its eggs in one basket. N.J.S.A. 56:10-3 (emphasis added). Defendant has cited Finlay & Associates v. Borg-Warner, 146 N.J. Super. 210 (Law Div. 1976), which found that a franchise did not exist in part because "plaintiff by its own choice elected to concentrate on the line of merchandise it preferred." Id. at 220. However, later law has suggested that Finlay applied a "rather narrow definition of 'license.'" Colt Indus., Inc. v. Fidelco Pump & Compressor Corp., 700 F. Supp. 1330, 1335 (D.N.J. 1987). For example, the ISI court found that a community of interest existed where 97% of ISI's revenue came from sale of the franchisor's products. ISI, 130 N.J. at 365. Further, although Plaintiff could apparently sell other products in theory, the agreement between the parties prohibited him from selling products which "in the sole opinion of" Defendant, would compete with Snyder's-Lance products. SAC Ex. B, Art. 5. As Plaintiff pleads, S-L distributes over 200 snack items, and therefore it would be quite difficult to sell snack food products that do not compete with S-L. Id. ¶ 48. The restriction makes Plaintiff, like the franchisee in ISI, "unlike a department store that could sell both Sony and Zenith televisions or market both Apple and IBM computers." ISI, 130 N.J. at 364.

Further, New Jersey courts have suggested that transferability does not destroy a community of interest. See Neptune T.V., 190 N.J. Super. at 163-64 (indicating that one of the abuses that the Act was intended to address is where a franchisee expends efforts and capital in establishing a franchise, and is then "vulnerable to termination of the franchise . . . and the inability to realize the benefits of his business by selling it . . . ."). In light of the allegations of economic dependence in the SAC, the Court finds that the SAC meets the community of interest requirement.

3. New Jersey Place of Business

Defendant's final objection related to the NJFPA relates to its requirement that franchisees have or contemplate having an office or warehouse located in the State of New Jersey. N.J.S.A. 56:10-4(a).[6] When a franchisee does not make a majority of its sales directly to consumers, the place of business must be a

> fixed geographic location  at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services, or an office or a warehouse from which franchisee personnel visit or call upon customers or from which the franchisor's goods are delivered to customers.

N.J.S.A. 56:10-3(f).

Plaintiff has pled that he maintains a warehouse in the State of New Jersey. The SAC indicates that he operates out of a warehouse in Runnemede, New Jersey, at which he receives shipments of S-L products. SAC ¶¶ 13, 87. He indicates that he and other members of the putative class pay $35 per week to S-L for warehouse rent. Id. The contract between the parties also indicates that Plaintiff "represents and agrees that it currently maintains and shall continue to maintain throughout the course of this Agreement, a separate place of business . . . from which it conducts, and shall conduct, its business." SAC Ex. C. Art. 20.

Plaintiff alleges that he sells to retailers, not consumers. SAC ¶ 22. The SAC alleges that Plaintiff, a franchisee, receives shipments of S-L products at the warehouse and moves them from there to retail outlets. Id. ¶ 87. The allegation that Plaintiff and other similar distributors "receive shipments of Snyder's-Lance products from S-L for sale to retail outlets" at the warehouse is sufficient to satisfy the statutory requirement of a "warehouse . . . from which the franchisor's goods are delivered to customers." Id.; N.J.S.A. 56:10-3(f).

---

[6] Like the community of interest issue, the Court did not reach the New Jersey place of business issue in deciding Defendant's prior motion to dismiss.

Defendant cites cases decided before the language about "call upon customers" and "goods are delivered to customers" was added to the statute, and thus these are not helpful. The 2010 amendments to the NJFPA were designed to:

> afford <u>wholesale distribution businesses</u> the protections of the New Jersey Franchise Practices Act, rectifying the anomaly that exists under current law, where a distribution business that requires its customers to come to its place of business to buy goods is treated as a franchise, while one that incurs the extra burden of providing the service of going to its customers to deliver its products and make sales does not receive the act's protections.

2009 N.J. Sess. Law. Serv. 235 (Assembly 2491) (Assembly Floor Statement) (emphasis added). Thus, the amendments were designed, in part, to prevent distributors such as Plaintiff who deliver wholesale products to customers from being excluded from the protections of the NJFPA on the basis of lack of an office or warehouse in New Jersey.

Defendant also argues, without citing law, that the requirement that a franchisee "establish or maintain a place of business" in New Jersey is not satisfied because S-L owns the warehouses. <u>See</u> N.J.S.A. 56:10-4; Def. Mot. Dismiss at 25 ("the warehouse space belonged to and was maintained by S-L.") One of the definitions of "maintain" set forth in Black's Law Dictionary is "[t]o continue in possession of (property, etc.)." MAINTAIN, Black's Law Dictionary (9th ed. 2009). It is this definition that the Court believes the statute is referring to when it requires a New Jersey place of business. To require maintenance in the sense that a landlord may have the ultimate responsibility to maintain leased premises would mean that many franchisees who operate out of rented premises would not be protected by the NJFPA, which would be a tortured reading of the Act. This Court observes no requirement that a place of business must be owned by the franchisee to constitute a place of business. Additionally, Defendant has not shown why Plaintiff did not "establish" a place of business by operating out of

rented warehouse space, even if he did not "maintain" a place of business. N.J.S.A. 56:10-4(a). The Court further rejects the argument of Defendant that the allegation that Plaintiff pays $35 per week in warehouse rent is a legal conclusion. See Def. Mot. Dismiss at 21.

### B. Delay, Dilatory Tactics, and Prejudice

Defendant also objects to the proposed amendment because of what it characterizes as undue delay, dilatory tactics, and prejudice to S-L. Under the Rule 15 standard, delay alone "is an insufficient ground upon which to deny a motion to amend. Rather, the touchstone is whether the non-moving party will be prejudiced if the amendment is allowed." Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984) (citing Cornell and Co., Inc. v. Occupational Safety and Health Review Commission, 573 F.2d 820 (3d Cir. 1978)). Prejudice to the non-moving parties must be balanced against the reasons for the amendment. Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 174 n.7 (3d Cir. 2010) (citations omitted).

The Order of this Court of December 18, 2012 clearly contemplated that Plaintiff could attempt to cure the deficiencies in his complaint. Delay in having the motion heard did result from Plaintiff's ill-advised attempt to file a motion to amend the complaint while concurrently appealing to the Third Circuit. This resulted in a delay of approximately five months, as the initial motion for leave to amend was filed on January 4, 2013, and the instant (and nearly identical) motion was filed on June 14, 2013. Although Defendant is not to blame for the five-month delay, the Court does not find that the delay was "undue" or that it was a dilatory tactic. The Court also does not find that any significant prejudice accrued to Defendant on account of the five-month delay. Defendant cites only the additional expense that it must incur in order to continue to defend the suit. Def. Opp'n at 27-28. However, this is more relevant to the merits of

the proposed amendment than to the issue of prejudice. The costs incurred in defending a lawsuit are not unique to this case. Therefore, the Court declines to reject the proposed amendment due to alleged undue delay, dilatory tactics, or prejudice to S-L.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiff's motion seeking leave to amend will be **GRANTED**. An accompanying order shall issue today.

Dated:  01/29/2014                              /s/ Robert B. Kugler
                                                ROBERT B. KUGLER
                                                United States District Judge